**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CHANDRA POPE,**
**Natural Parent on behalf of**
**R.T.S.,[1] a minor,**

        **Plaintiff,**

                                **Civil Action 2:18-cv-246**
      **v.**                          **JUDGE MICHAEL H. WATSON**
                                **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

       Plaintiff, Chandra Pope ("Plaintiff"), on behalf of her minor child ("R.T.S."), brings this

action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social

Security ("Commissioner") finding his disability ceased on May 1, 2014 and he no longer

qualified for Social Security Supplemental Security Income benefits ("SSI"). This matter is

before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's

Statement of Errors (ECF No. 8), ("SOE"), the Commissioner's Memorandum in Opposition

(ECF No. 13), Plaintiff's Reply (ECF No. 14), and the administrative record (ECF No. 7). For

the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a)(3), the name of an individual known to be a
minor in a filing with the Court may only include the minor's initials.

Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.     BACKGROUND

Plaintiff filed an application for benefits on behalf of her minor child, R.T.S., alleging that R.T.S. has been disabled since June 3, 2009.   (R. at 160-62.)   R.T.S. was found disabled due to speech and language disorder that caused an extreme limitation in the domain of Acquiring and Using Information as of June 3, 2009.   (R. at 10-14.)   The Commissioner conducted a continuing disability review on May 5, 2014.   (R. at 72-79.)   Plaintiff requested reconsideration and the decision was affirmed on June 20, 2015, by a State Agency Disability Hearing Officer.   (R. at 83-94, 95-105.)   Thereafter, Plaintiff filed a written Request for Hearing on September 4, 2015.   (R. at 113.)   Administrative Law Judge Paul Yerian ("ALJ") held a hearing on June 12, 2017, at which Plaintiff and R.T.S., who was represented by counsel, appeared and testified.   (R. at 41-65.)   On July 19, 2017, the ALJ issued a decision finding that R.T.S. was not disabled within the meaning of the Social Security Act.   (R. at 10-26.)   On January 26, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.   (R. at 1–6.)   Plaintiff then timely commenced the instant action.

## II.     PLAINTIFF'S HEARING TESTIMONY

R.T.S. was eleven years old at the time of the administrative hearing.   (R. at 40-41.) R.T.S.'s mother testified at the hearing that R.T.S.'s medications include Clonidine and Strattera. (R. at 44.)   She testified that the family went to church every other Sunday and R.T.S. interacted with other kids at church.   (R. at 55.)   Plaintiff indicated that the Sunday school teachers would come get her out of church services if R.T.S. was acting up.   (R. at 56.)   Plaintiff testified that

2

R.T.S. was passing his classes.   (R. at 56.)   He was in a small classroom setting with some additional help and resources.   (*Id.*)   Plaintiff testified that R.T.S. fought with his older sibling over videogames because his older brother would take over the game.   (R. at 57.)   He did not perform his chores, and needed constant reminding or a threat of punishment such as taking the game away, until he cleaned his bedroom.   (*Id.*)   He did not have his own friends but got along well with his sister and her friends.   (R. at 58.)   Plaintiff acknowledged that R.T.S. can ride a bicycle.   (*Id.*)   Plaintiff testified that R.T.S. was no longer receiving speech therapy at school. She testified that R.T.S. could use a tablet to watch videos.   (R. at 59.)   Plaintiff testified that he was combative at home.   (R. at 60-61.)   She testified that R.T.S. recently had been disciplined at school for behavior and that she had received three or four calls stating that he was cussing at the teachers.   (R. at 63.)

R.T.S. testified at the hearing that he had just finished the fourth grade.[2]   (R. at 46.)   He enjoyed playing video games.   (R. at 46-47.)   He played outside, and had some friends at school with whom he played football.   He does not have friends in his neighborhood, but he plays with his sister's friends.   (R. at 50.)   He enjoyed sports.   (R. at 49, 51.)   He testified to some problems at school with bullying.   (R. at 48.)   He reported fighting with other students. (R. at 50, 52.)   He indicated that he got mad at school and threw a chair.   (R. at 53.)   He testified that he "used to have bad dreams" since he was five years old but that he was sleeping okay.   (R. at 53.)

---

[2] The ALJ noted in his decision that R.T.S. "had obvious speech and language delays but was able to communicate and answered questions."   (R. at 16.)

### III.     MEDICAL RECORDS

#### A.     Nationwide Children's Hospital

R.T.S. underwent a speech/language evaluation in June 2009, when he was 3 years old, which demonstrated significantly delayed language skills and delayed social language (pragmatic) skills.   (R. at 374-77.)   R.T.S. was determined disabled in 2009, due to his significant delay in language skills, resulting in an extreme limitation in the domain of acquiring and using information.   (R. at 378-83.)

R.T.S. returned to Nationwide Children's Hospital Behavioral Health Department due to developmental and speech delays in July 2012 when he was 6 years old.   (R. at 499-512.)   It was noted that R.T.S. sought shared enjoyment and attempted to have others involved in his play. R.T.S. presented with a significant speech delay and did not begin speaking single words until 4 years of age.   At the time of this evaluation, R.T.S. spoke in three to four-word phrases. He did provide eye contact and used gestures when communicating with others.   R.T.S. did not present with any repetitive behaviors or repetitive motor mannerisms.   Based on direct observation and parent report, R.T.S. does not meet criteria for Autism Spectrum Disorder.   (R. at 506.)   R.T.S. was assessed with a learning disorder, nos; and mixed receptive-expressive language disorder; status: rule out.   (*Id.*)   It was recommended that R.T.S continue with the services that he is receiving through the board of developmental disability.   His family was encouraged to have R.T.S. connected with private speech therapy by requesting a prescription through his pediatrician; and his family was encouraged to have R.T.S. connected with outpatient therapy to work through the trauma that he witnessed.[3]   (R. at 507.)

---

[3] R.T.S. witnessed his father abuse and shoot his mother as a young child.   (*See, e.g.*, R. at 504, 774.)

R.T.S. was referred back to Nationwide Children's Hospital Behavioral Health Department on May 19, 2014, noting he had been previously evaluated for autism and was still experiencing extreme poor social interactions, he was shy, and had inappropriate response, speech delay and developmental delay.   (R. at 498.)

### B.   Access Ohio/Marilynn J. Peters, M.D.

R.T.S. underwent a diagnostic assessment on November 14, 2014, due to concerns autism, Post-traumatic stress disorder ("PTSD")-related nightmares, and possibly Attention-deficit hyperactivity disorder ("ADHD").   (R. at 773-88.)   The intake social worker noted that R.T.S. had a good relationship with his family.   (R. at 774.)   He got along "okay" with everyone, and his peer relationships and social functioning were noted to be "good."   (R. at 775, 777.)   It was also reported that R.T.S. saw his mom and biological father fight a lot as a young child, and he witnessed his father shoot his mother.   R.T.S. reported he experienced nightmares related to his father getting released from prison and the shooting incident being "stuck in my head," which effected his sleep.   His mother reported R.T.S. lost focus, was easily distracted, and had difficulty completing tasks.   (R. at 784.)   On mental status examination, R.T.S. was well groomed, with average demeanor and activity.   He exhibited no delusion and was not aggressive; thought process was concreate, mood euthymic, with cooperative behavior.   He was impaired in his attention/concentration and his intelligence was estimated to be borderline with fair to poor insight and judgment.   (R. at 787.)   The intake social worker assessed R.T.S. with Autism spectrum disorder, with accompanying intellectual impairment, per history, PTSD and ADHD, predominately inattentive presentation.   (R. at 784.)   R.T.S. was referred for community psychiatric supportive treatment (CPST), psychotherapy, medication and psychiatric services.   (R. at 785.)

5

R.T.S. underwent an initial psychiatric evaluation with another psychiatrist (not Dr. Peters) that same day who prescribed him Adderall.   (R. at 748-51.)

On May 5, 2016, Marilynn J. Peters, M.D., completed a functional assessment in which she found that R.T.S. had marked limitations in the domains of acquiring and using information as well as attending and completing tasks and interacting appropriately with others.   (R. at 581-82.)   Dr. Peters based her assessment on R.T.S.'s diagnosis of receptive-expressive language disorder, his learning disorder, and ADHD (Impulsive).   Dr. Peters noted that R.T.S. was not diagnosed on the autism spectrum.   (R. at 581.)   Dr. Peters could not comment on the domains of moving about and manipulating objects; caring for self; and health and physical well-being. (R. at 582-83.)

On June 2, 2016, Dr. Peters saw R.T.S., who reported that the end of the school year was great and that he passed this school year with all good grades.   Dr. Peters noted that R.T.S. was well-groomed, cooperative, with logical thought processes, and positive thought content.   He was euthymic with full affect, had no abnormalities with perception and no gross defect with insight or judgment, and no side effects from medication.   She continued R.T.S. on Adderall and Clonidine for sleeping issues.   (R. at 578-79.)

In August 2016, Dr. Peters noted that R.T.S. was attending a new school after having had an enjoyable summer vacation in Florida.   R.T.S. had been taking only the Clonidine, having run out of his Adderall.   Dr. Peters noted that R.T.S. was very pleasant, more spontaneous, and that he reported he had not gotten hyper at school.   (R. at 766-67.)


In December 2016, Dr. Peters noted that R.T.S. reported he was doing "fine, real good" in school, including all A's.   His teachers were attentive to his complaints of a

single bully.   Dr. Peters noted that R.T.S. was calm and organized, and no abnormalities were noted, and R.T.S. denied negative side effects from medication.   (R. at 758-59.)

In May 2017, R.T.S. reported he "said the F word on accident" in school, but he was better functioning in school, and no problems at home.   (R. at 752.)   While R.T.S. reported taking Strattera, his stepfather noted issues of non-compliance.   On mental status examination, Dr. Peters found R.T.S. was well groomed, calm, cooperative, with logical thought processes, and he was "motivated."   He was euthymic with full affect, had no abnormalities with perception and no gross defect with insight or judgment, and no side effects from medication. (R. at 752-53.)

### C.       Consultative examination: Jack J. Kramer, Ph.D.

On April 21, 2014, Dr. Kramer evaluated R.T.S. for disability purposes.   (R. at 483-89.) At the time of this evaluation, R.T.S. was 8 years 3 months old.   Dr. Kramer noted R.T.S. presented as healthy and well groomed, and was noted to be a "compliant and happy youngster throughout both the interview and testing portions of the examination."   Dr. Kramer noted "[h]e responded appropriately when asked questions . . . [and] sat calmly next to his mother."   (R. at 483.)   Plaintiff reported to Dr. Kramer that R.T.S. worked with a speech therapist and an occupational therapist at school and that academic skills had been harder for him to learn. Plaintiff reported that R.T.S. was "well behaved at school" with "no history of school suspensions."   He received instructions in both a regular first grade classroom and in a special education classroom for a portion of the day.   R.T.S. was "pleasant, compliant, and cooperative" and Plaintiff said behavior problems at home were minimal.   (R. at 484.)

Dr. Kramer administered the WISC-IV (Wechsler Intelligence Scale for Children), which resulted in verbal comprehension index of 69; perceptual reasoning of 75; working memory of

77; and processing speed index of 80 with a Full-Scale IQ score of 70.   (R. at 485.)   Dr. Kramer concluded that R.T.S. cognitive skills appear to be within a borderline range.   (R. at 486.)   Dr. Kramer wrote that R.T.S. worked hard but was a "little slow to process information and that skills are harder for him."   (R. at 484.)   Dr. Kramer reported that R.T.S. was responsive to questions and his concentration, pace, and persistence were adequate, or better, for all interactions.   (R. at 484-85.)   His speech was mostly intelligible, and his language was relevant and coherent, although a little developmentally immature.   R.T.S. said he enjoyed playing with his toys and siblings, being outside, and playing video games.   He liked going to school and had a few friends.     R.T.S. was able to pick out his clothes and dress in the morning, do chores like taking out the trash and cleaning his room with reminders, and get his own snacks.   (R. at 485.)

As to R.T.S.'s functional assessment, Dr. Kramer concluded that in the area of acquiring and using information, R.T.S. "appeared alert, but slow to process answers and well behind expectations in his ability to problem-solve."   In Interacting and Relating with Others, his skills were noted to be "a little immature," but no serious social problems were noted.   His abilities and limitations in Self-Care were mostly normal, with only some reminders and occasional assistance needed.   R.T.S.'s abilities and limitations in Attending to and Completing Tasks suggests some limitations in ability to concentrate, but he "seems able to focus and complete tasks he enjoys and did a good job with attention and task persistence during th[e] examination." (R. at 486-87.)

### D.  State agency review

Twice in 2014 R.T.S.'s childhood disability claim and medical record were reviewed, analyzed, and his limitations evaluated in each of the six functional domains.   (R. at 491-96, 519-23.)   In May, John L. Marmol, M.D., and Tonnie Hoyle, Ph.D. determined that R.T.S.'s

8

impairments did not meet, medically equal, or functionally equal any listed childhood impairment. (R. at 491.) They concluded that the educational and medical record demonstrated "less than marked" limitation in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others; and "no" limitation in the domains of moving about and manipulating objects, caring for oneself, and health and physical well-being. (R. at 493-94.) They concluded that significant medical improvement has been shown. (R. at 496.)

In October, 2014, reviewing the updated medical record in October, psychologist Leslie Rudy, Ph.D., and pediatrician, Bruce Mirvis, M.D., assessed a marked limitation in in the domain of acquiring and using information finding that R.T.S.'s overall language skills just fell 2 standard deviations from the mean, and based on his April 2014 I.Q. scores and school evidence indicated delays in reading and math. (R. at 519-23.)

## IV. EDUCATIONAL RECORDS

In assessing R.T.S.'s special education services transition from preschool to kindergarten in May 2012, an evaluation team, consisting of teachers, counselors, school psychologist and therapist, from Columbus City Schools completed an Evaluation Team Report ("ETR"). (R. at 385-419.) R.T.S. was first identified educationally as a preschooler with special needs in October 2009. (R. at 386.) He received classroom-based intervention services for speech, occupational and physical therapy. (*Id.*) As part of the ETR, R.T.S. took the Kaufman Assessment Battery for Children which revealed a below average score in sequential processing; a lower extreme range score in simultaneous processing; an average score in learning ability; and a lower extreme score in mental processing. (R. at 387.) The Vineland II Adaptive Behavior Scaled revealed significant deficits in the areas of communication, socialization, and daily living

skills.  (*Id.*)  The ETR team concluded that R.T.S. was unable to demonstrate friendship seeking behavior, have a best or preferred friend, choose not to say embarrassing things in public, play cooperatively with one or more children for up to 5 minutes, or talk with others without interrupting.  (R. at 389.)  It was also noted that he needed to improve social interaction skills, social play skills, self-control, and emotional regulation and he needs to further develop self-image and self-confidence.  (R. at 390.)

In March 2013, when R.T.S. was in kindergarten, his education team completed an Individualized Education Program ("IEP") for his transition to school age services.  R.T.S.'s 2013 IEP noted that he exhibited behaviors such as threatening words or gestures, teasing, and noncompliance with teacher requests which has greatly improves since the beginning of the school year.  (R. at 423-24.)  The IEP also noted that R.T.S. still has a difficult time dealing with large or loud events such as assemblies.  (*Id.*)  R.T.S. has made "great strides in academics.  He knows all the letters and the common sounds that letters make.  He is now reading at a TRC level B, and can read at least 23 words on the kindergarten word wall list. Plaintiff sees reading as R.T.S.'s most important area.  She notes "that he loves to read."  His ability to write is also much improved. In the area of math, R.T.S. can count by rote to at least 50, sometimes higher, he can identify numbers to 30, not always consistently, and knows the days of the week, months, etc.  (R. at 424.)

His 2014 IEP showed R.T.S. exhibits a moderate articulation impairment and a severe language impairment.  He received a TOLD-F4 P4 (Test of Language Development), standard score of 60 and a standard score of 74 on Goldman Fristoe Test of Articulation which places R.T.S. well below average for his age.  (R. at 464.)  It was noted that his low language skills

hinder his participation and performance in the classroom discussions, socialization activities, and reading/writing tasks. (*Id.*) R.T.S. was placed in language therapy, speech therapy, and occupational therapy. His teacher reported that R.T.S. has continued to work hard at maintaining speech sounds but struggled with /r/ and /sh/ in sentences; had difficulties identifying similarities and differences in words and giving examples of synonyms and antonyms. (*Id.*) R.T.S.'s reading level was at the lower kindergarten level. In math, R.T.S. was able to add double digit numbers without carrying confidently and perform double digit carrying but he was not consistent. He recognized coins and knew their value. He was able to add simple coins to a specific amount, but did not do this consistently. R.T.S. was able to tell time to the hour, 1/2 hour and 5 after. R.T.S. wrote neat and legible and he was able to write 4-5-word sentences. During this school year R.T.S. was receiving occupational therapy working on his pencil grip. (*Id.*)

R.T.S. underwent his three-year evaluation, with an updated ETR in April 2015, when he was 9 years old in the second grade. (R. at 535-52.) Following the assessment results and description of his education needs, R.T.S.'s team concluded that he needed specialized instruction and significant modification and support to compensate for educational deficits in reading, writing, and math. They noted that he was likely to need directions repeated, assignments and information broken down into smaller parts and repetition for new material. (R. at 550.)

In February 2016, R.T.S.'s third grade teacher completed an assessment scale in which she reported that R.T.S. failed to give attention to details, had difficulty organizing tasks and activities, was easily distracted, left his seat in the classroom, interrupted others, and was fearful or anxious. (R. at 570.) She also noted that he had somewhat of a problem with written

11

expression; following directions; disrupting class; assignment completion; and organizational skills.   (R. at 571.)

## V.   ADMINISTRATIVE DECISION

On July 19, 2017, ALJ Yerian issued his decision.   (R. at 10–26.)   The ALJ noted that the most recent favorable medical decision finding that R.T.S. was disabled is the determination dated July 21, 2009.   This is the "comparison point decision" or CPD.   At the time of the CPD, R.T.S. had the following medically determinable impairments: speech and language disorder. (R. at 13.)   The ALJ concluded medical improvement occurred as of May 1, 2014.   The ALJ then determined that since that time, the impairments that R.T.S. had at the time of the CPD have not functionally equaled the Listings.   (R. at 14.)   Since May 1, 2014, the ALJ found that R.T.S. suffered from "severe" speech and language disorder; borderline intellectual functioning; ADHD; and specific learning disability within the meaning of 20 C.F.R. §416.924(c).   (R. at 15.)   He concluded, however, that R.T.S. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.   (R. at 16.)   In the six domains used to determine a child's functional equivalence, the ALJ found that R.T.S. has "less than marked" limitation in the domains of acquiring and using information,[4] attending and completing tasks, and interacting and relating with others; and "no" limitation in the domains of moving about and manipulating objects, caring for oneself, and health and physical well-being.   (R. at 20-26.)   The ALJ consequently concluded that R.T.S.'s disability ended as of May 1, 2014, and he has not become disabled again since that date.   (R. at 26.)

---

[4] As discussed more fully, *infra*, the ALJ found that R.T.S. had a marked limitation in this domain.

# VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.    SEQUENTIAL EVALUATION PROCESS IN CONTINUING DISABILITY REVIEW OF CHILD DISABILITY

Pursuant to Title XVI of the Social Security Act, "[a]n individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."    42 U.S.C. § 1382c(a)(3)(C)(i).    The Act generally requires continued eligibility for benefits after the initial determination of eligibility and requires termination of benefits if the individual is no longer eligible.    *See* 42 U.S.C. § 423(f).    Not less frequently than every three years, the Commissioner must conduct a "continuing disability review" to determine whether the individual is eligible for benefits.    *See* 42 U.S.C. § 1382c(H)(ii)(I).

The framework used to review SSI benefits previously awarded to a child is set forth at 20 C.F.R. § 416.994a.    Under the regulations, the ALJ determines in the first step of the analysis whether there has been "medical improvement" from the most recent favorable determination (*i.e.*, the "comparison point decision" or "CPD").    20 C.F.R. § 416.994a(a)(1).    If there has been no medical improvement, the child's disability typically will be deemed to continue.    20 C.F.R. § 416.994a(b)(1).    If there has been medical improvement, the ALJ must determine at step two whether the impairment(s) considered during the CPD still meets or equals the severity of the listed impairment it met or equaled at that time.    If the impairment(s) meets or equals the severity of the listed impairment it met or equaled at the time of the CPD, the claimant typically is deemed to be disabled. 20 C.F.R. § 416.994a(b)(2).

14

If there has been medical improvement in the claimant's impairment(s) and the impairment(s) no longer meets or equals the severity of the listed impairment that it met or equaled at the time of the CPD, the ALJ will proceed to step three and consider whether the claimant is disabled under the rules in 20 C.F.R. § 416.924(c) and (d). 20 C.F.R. § 416.994a(b)(3).   Under these provisions, the child must have a severe impairment or combination of impairments that meet, medically equal, or functionally equal one of the impairments identified in 20 C.F.R. Part 404, Subpart P, Appx. 1. 20 C.F.R. § 416.924(a); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).   If a child's impairment(s) does not meet or medically equal a listed impairment, the Commissioner assesses all functional limitations caused by the impairment(s) to determine if the child's impairment(s) is functionally equivalent in severity to any of the listed impairments.   20 C.F.R. § 416.926a.   The Commissioner considers six areas of development in determining whether a child's impairments are functionally equivalent to a listed impairment:   (1) acquiring and using information; (2) attending and   completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.   20 C.F.R. § 416.926a(b)(1)(i)-(vi).   To meet the "functional equivalence" requirement, the claimant must have a severe impairment that results in "extreme limitation" in one area of functioning or "marked limitations" in two areas of functioning. 20 C.F.R. § 416.926a(d).

A claimant has a "marked" limitation if the claimant's impairments seriously interfere with the claimant's ability to independently initiate, sustain, or complete activities.     20 C.F.R. § 416.926(e)(2)(i).   A "marked" limitation is more severe than "moderate" and less severe than "extreme."   20 C.F.R. § 416.926(e)(2)(i).   An impairment causes an "extreme" limitation when it interferes very seriously with the claimant's ability to independently initiate, sustain, or

complete activities.   20 C.F.R. § 416.926(e)(3)(i). In determining the effect of an impairment on the six domains, the Commissioner considers information from medical sources, parents and teachers, and consultative examiners.   20 C.F.R. § 416.926a(b)(3).

## VIII.   ANALYSIS

In her Statement of Errors, Plaintiff contends that the ALJ's determination that a medical improvement occurred is not supported by substantial evidence.   Plaintiff also argues that the ALJ erred by finding R.T.S.'s limitation to be "less than marked" impairments in the functional domains of acquiring and using information and interacting and relating to others.   Plaintiff further contends that the ALJ failed to properly evaluate the treating source medical opinions of Dr. Marilynn Peters and, as a result, erred in failing to grant controlling weight to her opinion. (ECF Nos. 8 and 14).   In response, the Commissioner essentially disregards Plaintiff's contentions of error and recasts her arguments to suit his analysis.   He asserts that Plaintiff's arguments "are just slightly different ways of expressing her disagreement with the amount of weight given to the four medical opinions of evidence."   (Def's Brief, ECF No. 13 at p. 11.) The Undersigned disagrees.   Because the Commissioner has failed to refute Plaintiff's contentions that the ALJ improperly determined that R.T.S. experienced "medical improvement" under the agency's rules and regulations and improperly evaluated the domain of acquiring and using information, and based upon an independent analysis, the Undersigned concludes that substantial evidence does not support the ALJ's determination in these regards.   The Undersigned finds that remand is appropriate.[5]

---

[5] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.   Thus, the Undersigned need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand.   Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

Plaintiff's arguments regarding the ALJ's assessment as to whether R.T.S. experienced "medical improvement" or properly evaluated the domain of acquiring and using information are related. The Commissioner addressed neither argument. Although the Court could deem the matters conceded, the Undersigned nevertheless provides the following analysis on these two subjects.

The operative regulations define "medical improvement" as follows:

> Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable decision that you were disabled or continued to be disabled. Although the decrease in severity may be of any quantity or degree, we will disregard minor changes in your signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not result in a finding that your disability has ended. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994a(c); *Tubbs v. Comm'r Soc. Sec.*, No. 1:11-cv-1046, 2013 WL 1305290, at *2–3 (W.D. Mich. 2013).

Here, the ALJ determined that R.T.S.'s speech and language disorder no longer resulted in an extreme limitation. The ALJ's reasoning was limited:

> [R.T.S.'s] speech and language disorder no longer results in extreme limitation. At the time of the CPD, [R.T.S.] had standardized language scores three standard deviations below the mean. Subsequent testing shows standardized langue scores only two standard deviations below the mean, consistent with medical improvement related to speech and language deficits. . . .

(R. at 14.)

The ALJ analyzed R.T.S's domain of "acquiring and using information" as follows:

> Since May 1, 2014, the claimant has had ***less than marked limitation*** in acquiring and using information, including as a result of the impairments present at the CPD.
>
> The most recent speech and language evaluation revealed a core language score of 70, a significant improvement from prior testing, although consistent with severe mixed expressive/receptive language deficits. The claimant had moderate articulation disorder but intelligibility over 90% in all contexts (Exhibit 9F). Likewise, Dr. Kramer observed 80-85% intelligibility in the unknown context but closer to 95% in known contexts. The claimant's verbal comprehension as a relative weakness during testing with a full scale IQ of 70, indicative of borderline intellectual functioning. Dr. Kramer noted that the claimant was able but slow to process answers and well behind expectations in his ability to problem-solve. Most cognitive skills appeared within the borderline range. He struggled to learn new skills (Exhibit 1OF). He received services for specific learning disability. He made steady and mostly adequate progress in all areas at school, however, with interventions, including special education and speech therapy (Exhibits 3F, SF , 6F, 8Fm 13F, 15F, 16F, 17F, 18F, 21F, 24E). Thus, the evidence supports ***marked limitation*** in this area.

(R. at 21, emphasis added.)

To begin, the ALJ's assessment is internally inconsistent. The ALJ first indicates that R.T.S. has "less than marked limitation," but then indicates that he has "marked limitations" in the area of acquiring and using information. The Undersigned will ignore this inconsistency and regard it as a typographical error. *See Calkins v. Sec'y of Health and Human Servs.*, 793 F.2d 1290 (Table), 1986 WL 17083, at *1–2 (6th Cir. 1986) (holding district courts may disregard "a rather obvious typographical error in the ALJ's opinion" and examine "the opinion as a whole to interpret the true meaning of the ALJ's findings."); *see also Gribbins v. Comm'r Soc. Sec. Admin.*, 37 F. App'x 777, 779 (6th Cir. 2002) (stating that "[t]he findings and conclusions of the Commissioner are reviewed by this court in the context of the record as a whole" and finding that the district court "did not err in finding mere typographical error in the ALJ's second statement regarding residual functional capacity" when reviewing "the hearing transcript and the ALJ's decision *in pari materia*") (citations omitted); *Yerian v. Comm'r Soc. Sec.*, No. 2:17-cv-562, 2018

WL 3045076, at *5 (S.D. Ohio June 20, 2018) (rejecting a contention of error based on a typographical error in the ALJ's discussion of the state agency reviewing psychologists' opinions because "[i]t is clear from the context as well as the decision as a whole, however, that the ALJ considered the opinions in assessing Plaintiff's mental RFC"), *report and recommendation adopted by* 2018 WL 4357479 (S.D. Ohio Sep. 13, 2018).

Nevertheless, reviewing the decision as a whole, the ALJ still erred in his assessment of R.T.S.'s domain of "acquiring and using information." In making the determination, the ALJ failed to mention or rely upon SSR 09-3p in evaluating the domain of "acquiring and using information." SSR 09-3p explains the proper method to evaluate school records, academic performance, and special education assistance:

> Accordingly, this domain considers more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school.
>
> . . . .
>
> Because much of a preschool or school-age child's learning takes place in a school setting, preschool and school records are often a significant source of information about limitations in the domain of "Acquiring and using information." Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain provided they result from a medically determinable mental or physical impairment(s). Other indications in school records that a mental or physical impairment(s) may be interfering with a child's ability to acquire and use information include, but are not limited to:
>
> • Special education services, such as assignment of a personal aide who helps the child with classroom activities in a regular classroom, remedial or compensatory teaching methods for academic subjects, or placement in a self-contained classroom.
>
> • Related services to help the child benefit from special education, such as occupational, physical, or speech/language therapy, or psychological and counseling services.
>
> • Other accommodations made for the child's impairment(s), both inside and outside the classroom, such as front-row seating in the classroom, more time to take

tests, having tests read to the student, or after-school tutoring.

The kind, level, and frequency of special education, related services, or other accommodations a child receives can provide helpful information about the severity of the child's impairment(s). However, the lack of such indicators does not necessarily mean that a child has no limitations in this domain. For various reasons, some children's limitations may go unnoticed until well along in their schooling, or the children may not receive the services that they need. Therefore, when we assess a child's abilities in any of the domains, we must compare the child's functioning to the functioning of same-age children without impairments based on all relevant evidence in the case record.

Although we consider formal school evidence (such as grades and aptitude and achievement test scores) in determining the severity of a child's limitations in this domain, we do not rely solely on such measures. We also consider evidence about the child's ability to learn and think from medical and other non-medical sources (including the child, if the child is old enough to provide such information), and we assess limitations in this ability in all settings, not just in school.

SSR 09-3P, Determining Childhood Disability—The Functional Equivalence Domain of "Acquiring and Using Information," 2009 WL 396025, at *3.

The ALJ's conclusion that there has been medical improvement in this domain is based primarily on an improvement in test scores.   An improvement in scores alone, however, is not substantial evidence.    The domain of acquiring and using information involves how well children perceive, think about, remember, and use information in all settings, including their daily activities at home, at school, and in the community.   *See* 20 C.F.R. § 416.926a(g) and SSR 09-3p; *Cooper v. Comm'r of Soc. Sec.*, Case No. 1:16-cv-240, 2016 WL 7077042, at *9 (S.D. Ohio, 2016).   "As SSR 09–3p suggests, an ALJ must consider more than just IQ scores when considering a child's level of impairment.   He must also find that the child's daily functioning level is consistent with those scores."   *Sewell ex rel. HMC v. Comm'r of Soc. Sec.*, No. 10-12520, 2011 WL 3566471, at *8 (E.D. Mich. July 20, 2011), report and recommendation adopted sub *nom. Sewell v. Comm'r of Soc. Sec.*, No. 10-12520, 2011 WL 3566401 (E.D. Mich.

Aug. 12, 2011) (quoting *Williams v. Astrue*, No. 09C6981, 2011 WL 1935830 (N.D. Ill. 2011) (citing 20 C.F.R. § 416.926a(e)(4)(ii))).

In his analysis, the ALJ discussed R.T.S.'s IQ scores, noting that they were indicative of borderline intellectual functioning. (R. at 21.) The ALJ also referred to several notes in support of R.T.S.'s continued limitations, indicating that R.T.S. was "well behind expectations in his ability to problem solve," "he struggled to learn new skills," "he received services for specific learning disability," and he required "interventions, including special education and speech therapy." These brief paragraphs provided by the ALJ do not constitute substantial evidence in support of medical improvement or provide a proper analysis of why R.T.S.'s abilities in this domain were no longer extreme, as he had been found at the time of the CPD.

The ALJ's determination that R.T.S. medically improved is not supported by substantial evidence. "The regulations governing an initial determination of childhood disability do not ask an ALJ to consider improvement but rather to 'compare your functioning to the typical functioning of children your age who do not have impairments.'" 20 C.F.R. § 416.926a(f)(1); *see also* SSR 09–2p ("The critical element in evaluating the severity of a child's limitations is how appropriately, effectively, and independently the child performs age-appropriate activities."). As one court explained:

> [P]resumably, a child with serious limitations could show a measure of progress and still fall within the marked or extreme functional categories compared to other children her own age. *Id.* The ALJ is required—and failed in this case—to compare the claimant to nonimpaired children her own age. The social security ruling that addresses this domain stresses that an ALJ should "focus first on the child's activities, and evaluate how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments." SSR 09–3p. Indeed, "[s]atisfactory grades awarded to special education students receiving support and modifications cannot automatically be equated to the grades of nonimpaired children without more discussion than the ALJ provided here." *Williams*, at *12, citing, 20 C.F.R. § 416.924a(b)(7)(iv)

21

("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments."). Thus, the ALJ's extensive reliance on the claimant's "improvement" does not address claimant's functionality in this domain and does not provide substantial evidence to support the ALJ's decision in this regard.

*Sewell*, 2011 WL 3566471, at *9.

Here, the ALJ failed to make this comparison. As the regulations make clear, satisfactory grades awarded to special education students receiving support and modifications cannot automatically be equated to the grades of nonimpaired children. *See* 20 C.F.R. § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments."). The record consistently documents R.T.S.'s continued difficulties in this domain. School records throughout the relevant period note that R.T.S. works with a special education teacher; his work is modified consistent with his abilities; he needs assistance in order to get his work done; his articulation errors and low language skills hinder his participation and performance in classroom discussions, socialization activities and reading/writing tasks; and testing in 2012 (TOLD-P4) indicated that R.T.S. was generally in the 1 percentile in speaking, grammar, and spoken language. (R. at 314; 328, 392; 485; 570.)

In 2014, R.T.S. was given intelligence testing by Dr. Jack Kramer. Dr. Kramer noted that R.T.S.'s cognitive skills and academic skills were well behind expectations for his age with scores of 69 in verbal comprehension and a full-scale IQ of 70, per the Wechsler Intelligence Scale for Children- Fourth Edition (WISC-IV). (R. at 483-488.) Dr. Kramer also noted that R.T.S. was "slow to process information and skills that are harder for him." (R. at 484.)

R.T.S.'s Individualized Education Program ("IEP") also documents his consistent problems in this domain. In 2014, it was noted that R.T.S. was placed in language therapy,

speech therapy, and occupational therapy and he continued to work hard at maintaining speech sounds but struggles with /r/ and /sh/ in sentences; has difficulties identifying similarities and differences in words and giving examples of synonyms and antonyms.   (R. at 464, 471.)   While there may be improvement, compared to his abilities in 2009, R.T.S. is still behind when compared to other children his age.   As noted in his IEP, "although his skills have improved in many areas, his expressive and receptive language skills including concepts and articulation remain significantly delayed."   (R. at 410.)

The ALJ's extensive reliance on R.T.S.'s "improvement" does not address his functionality in this domain.   The Undersigned therefore finds that the decision is not supported by substantial evidence.

## IX.      CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## X.      PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


August 5, 2019                                        */s/Elizabeth A. Preston Deavers*
                                                      Elizabeth A. Preston Deavers
                                                      Chief United States Magistrate Judge